# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 19-CR-4022-LTS-KEM |
| vs. | |
| | **REPORT AND** |
| PATRICK LAYNE STEFFENS and JEREMY WILLIAM LILLICH, | **RECOMMENDATION** |
| Defendants. | |

---

Currently pending are several motions to suppress filed by Defendants, as well as a motion to sever their joint trial filed by Defendant Jeremy William Lillich. *See* Docs. 27, 42, 50, 56. Defendants challenge their initial encounter with law enforcement, arguing that officers lacked probable cause or reasonable suspicion (the Government responds that the encounter was consensual). Defendant Lillich also argues that after officers discovered the existence of a federal warrant for Steffens, arrested him, and found drugs on his person, officers unreasonably detained Lillich as they waited for the arrival of a drug dog. Lillich further argues that he should not have been questioned without *Miranda* warnings at that time. In addition, Defendant Patrick Layne Steffens challenges the affidavit in support of the warrant to search his cell phone, arguing that an insufficient nexus exists between his cell phone and any evidence of drug trafficking and that law enforcement intentionally or recklessly included false statements in the affidavit in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).

I held an evidentiary and *Franks* hearing on the motions to suppress on June 20, 2019, at which the following witnesses testified:

- Dan Neldeberg, owner of the car wash in Sloan, Iowa, where law enforcement's initial encounter with Defendants occurred;
- Sergeant Michael Lenz of the Woodbury County Sheriff's Office;
- Deputy Mike Simoni of the Woodbury County Sheriff's Office;
- Sergeant Nathan Sands of the Woodbury County Sheriff's Office;
- Drug Enforcement Administration Task Force Officer John Howard.

I also admitted the following exhibits into evidence:

- Government Exhibit 1 (video from Sergeant Lenz's body camera);
- Government Exhibits 2a and 2b (surveillance videos of the car wash bays);
- Government Exhibit 3 (video from Sergeant Sands's body camera);
- Government Exhibit 4 (video from Deputy Simoni's body camera);
- Government Exhibit 5 (K-9 certification records) (Doc. 73);
- Government Exhibit 6 (Woodbury County Sheriff's Office report regarding the attempted burglary of the Sloan car wash on January 1, 2019) (Doc. 74);
- Defendant Steffens's Exhibit A (search warrant application and affidavit) (Doc. 50-2);
- Defendant Steffens's Exhibit B (search warrant) (Doc. 50-3);
- Defendant Steffens's Exhibit C (video from Sergeant Lenz's body camera, surveillance videos from the car wash, and videos from Sergeant Lenz's and Deputy Simoni's police vehicles) (some of these videos are duplicative of the video exhibits submitted by the Government).

I recommend **granting in part and denying in part** Lillich's motion to suppress related to his detention (Doc. 27), **denying** Lillich's motion to suppress related to *Miranda* (Doc. 56), **denying** Steffens's motion to suppress (Doc. 50), and **denying** Lillich's motion to sever (Doc. 42).


## I.     BACKGROUND[1]

In the early morning hours of February 3, 2019, Sergeant Lenz and a reserve deputy with the Woodbury County Sheriff's Office were on patrol in the small town of

---

[1] The facts in this section come from the testimony at the suppression hearing and the video exhibits unless otherwise noted.

Sloan, Iowa, due to break-ins the night before at a church and a school. They noticed a vehicle in a car wash bay (around 3:00 a.m.) and decided to observe from a short distance away. Sergeant Lenz was concerned about a possible burglary, given the break-ins the night before, the late hour, and recent car wash burglaries in the surrounding area. With regard to the latter, Sergeant Lenz testified that he receives notifications that contain information about what occurred in Woodbury County on the previous shift, as well as a summary of crimes in surrounding counties. Through these notifications and word-of-mouth from other officers, he knew about car wash burglaries in Lawton, Correctionville, and Sergeant Bluff (towns in Woodbury County); as well as car wash burglaries in Monona County, Iowa; and Cherokee County, Iowa. Sergeant Lenz could not give any specifics about these burglaries—including any information about the suspects, how long ago the burglaries occurred, and the time of day they occurred—other than that the Lawton burglary involved a cash machine outside a bay being ripped from the wall and that the Sergeant Bluff burglary involved cash machines being broken into. Sergeant Lenz also knew about an attempted burglary of the money lockbox at the Sloan car wash about a month prior, which occurred on January 1, 2019, at around 7:00 p.m. *See* Doc. 74.

The Sloan car wash has two manual car wash bays that are open and lit twenty-four hours. Both bays have two doors, so that a person can drive in, stop and wash their car, and then drive out. The owner of the car wash testified that the bay doors are kept closed in the winter months so the bays stay heated. The south bay (entrance) doors are manual, opened and closed by rope pulleys. The north bay (exit) doors are automatic—they open by pressing a button and automatically close when the car drives over a sensor.

On the night in question, as the officers drove by the car wash, they could see a vehicle and a person's feet in a car wash bay that had the door closed, next to an empty

bay that had the door open (an automatic exit door).[2] Sergeant Lenz turned around, drove back past the carwash, and parked about half a city block away from the car wash with the lights off. From that location, Sergeant Lenz testified that they could see all the way into the back of the open car wash bay. He testified that he observed a person walk from the closed bay through a doorway to the back of the open bay, and then back into the closed bay, and that he believed the person might have been acting as a lookout (or coming to investigate based on the sound of Sergeant Lenz's car driving by). Surveillance video from the car wash shows that Steffens walked just outside the doorway in between the occupied and unoccupied car wash bays, stopped briefly (about one second) in the back of the unoccupied car wash bay with his body angled toward the open bay door, and then returned to the occupied bay. *See* Govt. Ex. 2A, 3:03:15-24[3] (video from the unoccupied bay—Steffens is visible in the bottom right corner); Govt. Ex. 2B 3:03:15-24 (video from the occupied bay). This is the only instance of Steffens leaving the occupied bay or otherwise looking out of it. Although it could be said that Steffens "looked out" of the car wash bay from the back of the bay, the surveillance footage shows he did not turn his head or otherwise "look around" in any way.

After seeing Steffens, the officers decided to investigate further. Sergeant Lenz and the reserve deputy entered the bay occupied by Defendants by walking through the open garage bay door of the empty bay and walking the length of the empty bay to the open door between the two bays (the door Steffens had just appeared in). They announced their presence as law enforcement as they did so (and Sergeant Lenz carried a flashlight). They wore their sheriff's deputy uniforms with their weapons holstered and visible on their person.

---

[2] I fully credit Sergeant Lenz's testimony on this issue.

[3] References to times in Government Exhibits 2a and 2b come from the time stamps on the videos; references to times in Government Exhibits 1 and 4 refer to the counter time on the video player.

In the car wash bay, they discovered Lillich and Steffens drying a car with the hood popped. They did not see any evidence indicating that Lillich and Steffens planned to burglarize the car wash. Sergeant Lenz asked Lillich and Steffens what they were doing at the car wash at 3:00 a.m., and Lillich responded that they had just been at the WinnaVegas Casino and that he often washes his car after going to the casino. Sergeant Lenz testified that in the past, he has been dispatched to the WinnaVegas Casino for drug trafficking activity and that the Woodbury County Sheriff's Office encounters drugs connected to the WinnaVegas Casino on an almost daily basis.

Sergeant Lenz explained to Lillich and Steffens that he was checking in based on the recent burglaries. He asked them for their identification, explaining that he needed their names for the report he would write about the contact. Steffens handed Sergeant Lenz a driver's license, and Lillich gave him an identification card, explaining that he was barred from driving and that Steffens had been driving the car. Sergeant Lenz recognized Lillich's name as a person involved with drugs. Sergeant Lenz radioed Lillich's and Steffens's information to dispatch, and while waiting for the results, he talked with Lillich and Steffens about their future plans for the night (they stated they were headed back to Sioux City).

After being on the scene for about four minutes, Sergeant Lenz went back to his car to scan the identification cards, while the reserve deputy stayed in the bay with Steffens and Lillich. The surveillance video from the car wash depicts Lillich seemingly asking the reserve deputy for permission to continue cleaning his car (which was granted—the reserve deputy gestures as if saying, "go ahead"). *See* Govt. Ex. 2B, 3:08:22. Shortly after Sergeant Lenz left the bay (about thirty seconds), another sheriff's deputy (Deputy Simoni) arrived and stood in the doorway between the two bays. While Sergeant Lenz was gone, Lillich and Steffens dried the car, and at various times, shut the hood and opened the driver's side and passenger side doors to access items in the car.

Sergeant Lenz returned after about three minutes and gave Lillich and Steffens their identification cards back. All three officers started to leave, going into the unoccupied car wash bay and walking across it toward the open bay door. Sergeant Lenz testified their encounter with the Defendants had ended and the deputies were leaving the scene. But before they made it to their cars, they received a notification from dispatch that there was a "hit" on Steffens for a United States Marshals hold and the existence of a federal arrest warrant related to "dangerous drugs." Because of the possible warrant for Steffens, the officers returned to the car wash bay occupied by Steffens and Lillich (about thirty seconds after they had left it). The officers did not immediately arrest Steffens on the warrant, as the existence of the warrant was not verified until about thirty minutes later.

Instead, the officers questioned Lillich about his car.[4] Lillich told the officers that he had purchased the car from Jimmy Merchant—who both Sergeant Lenz and Deputy Simoni knew to be "a thief" and involved in drugs. Deputy Simoni asked whether Lillich knew for sure the vehicle was not stolen, saying he "wouldn't trust Jimmy for nothing." An officer asked Lillich how much he had paid for the vehicle, and Lillich told him. During this questioning, Lillich held a car floor mat that he had been wiping down, and he asked Sergeant Lenz whether he could put the car mat back inside the car. Sergeant Lenz responded, "yeah, if you want to." The driver's side door was already open, and Lillich put the mat back in the car.

When he came back to where the officers were standing, Lillich asked, "Are we free to go?" Govt. Ex. 1, 1:11. Sergeant Lenz responded, "No, not right now, you might have a warrant, so we're just checking on that." Sergeant Lenz then conducted a pat-down search of Steffens. During the search, he discovered a baggie of

---

[4] Prior to this time, Sergeant Lenz and Deputy Simoni did not have their body cameras turned on, but they began recording video and audio around this time. *See* Govt. Ex. 1, 4.

methamphetamine. Sergeant Lenz arrested Steffens and placed him in the back of his car. He also seized Steffens's cell phone.

Because Lillich was barred from driving, when Steffens was handcuffed, Deputy Simoni suggested that Lillich "start calling" someone for a ride. Lillich tried to access his car to get his cell phone, but Sergeant Lenz blocked his path, explaining that he "did not know what's in there" but that an officer could retrieve the phone for Lillich. Deputy Simoni went into the car through the open driver's side door and looked for the phone but could not find it. While Deputy Simoni looked for the phone, the reserve deputy conducted a pat-down search of Lillich. No drugs were found on Lillich's person, although the officers did confiscate a small knife (which Deputy Simoni asked Lillich to remind him to return at the end of the encounter). Officers continued to look for the phone in the car, and eventually, Lillich rescinded his request for them to look for his phone.

After finding drugs on Steffens, officers called a K-9 officer to the scene to conduct a drug dog sniff of Lillich's car (that Steffens had been driving). While they waited for the K-9 officer, Lillich was not free to leave the scene (indeed, he asked to step outside, and the officer did not permit him to leave the car wash bay; he also asked if he could walk to the casino to find someone there to give him a ride, and the request was denied). Sergeant Lenz told Lillich, "It was a little weird, I was sitting up the street watching you guys, and [Steffens] kept peeking his head around the corner." Govt. Ex. 1, 9:59. He elaborated that he had seen Lillich look into the unoccupied bay and out through its open door. Lillich denied it, and Sergeant Lenz responded sarcastically, "Okay, then I'm seeing stuff." Lillich responded, "I think you are." Sergeant Lenz stated, "I don't think so." Sergeant Lenz asked whether Lillich and Steffens were meeting anyone at the car wash (implying he believed a drug transaction was to occur). Lillich stated that Steffens

"did not peek his head around the corner one time," and Sergeant Lenz said that was what drew his attention to the car wash and was the reason he was there.[5]

Officers testified that Lillich began chain smoking and became very sweaty, despite the 40-degree weather—to the point that Sergeant Lenz was concerned that Lillich had swallowed drugs because he was sweating so profusely. Lillich's face can be seen glistening with sweat in the body camera video. *See* Govt. Ex. 4, 22:00. At some point, Lillich asked whether he was under arrest, and an officer explained that he was currently being detained, but he was not under arrest.

When Sergeant Sands and his K-9 Rico arrived, they conducted a drug dog sniff of Lillich's vehicle. Rico alerted on the car. When officers searched the vehicle, they found approximately two pounds of methamphetamine and twenty-eight grams of cocaine inside a bag on the passenger's seat.

At a later date after Defendants' arrest, I issued a federal search warrant for Steffens's cell phone based on a supporting affidavit from Officer Howard. *See* Docs. 50-2, 50-3. Officer Howard prepared the affidavit based on his review of the officers' reports and by speaking with Sergeant Lenz on the telephone; he did not review the video evidence. The affidavit includes the following statements:

> [Sergeant] Lenz observed a subject looking out of the wash bay and looking around in a suspicious way as if the subject was looking for someone or watching out for potential police. [Sergeant] Lenz was aware that recent burglaries had occurred in the Sloan area in the overnight hours as well as

---

[5] In a phone call to Sergeant Sands, Deputy Simoni explained that "apparently, Steffens kept looking around the corner like they were meeting someone to sell," so Sergeant Lenz pulled into the car wash to start a conversation with them. Govt. Ex. 4, 14:07. Deputy Simoni added that the car had been purchased from "none other than Jimmy Merchant"; that Lillich had changed his mind about them looking for his phone in his car; and that Steffens had texted his girlfriend he was going to prison even before they found drugs on him; concluding "something weird is going on here." At the hearing, Sergeant Sands testified he was told that Steffens had gone into the open bay and "looked both ways" and that Steffens had looked out of the car wash bay more than once.

> having experience with subjects entering the wash bays and drilling through
> the locks to steal the money from the wash machines.

Doc. 50-2. The only information in the affidavit specifically about Lillich's and Steffens's use of cell phones is from a post-arrest interview with Steffens, where Steffens stated that on the night of his arrest, a third party (who he refused to name) had called and told him to go to the WinnaVegas casino to pick up Lillich (who Steffens knew only as "J") and give him a ride. Steffens said that he received a ride to the casino and met with Lillich, who told him to drive his car to Sioux City because he did not have a valid driver's license. Lillich also instructed Steffens to drive to the car wash so Lillich could wash his car. The affidavit also included a "belief statement" from the officer regarding his knowledge of the use of cell phones in drug trafficking activity.

## II. DISCUSSION

Lillich and Steffens both challenge the officers' initial contact with them at the car wash, arguing that the encounter was not consensual and that the officers lacked reasonable suspicion. Lillich also challenges his continued detention after officers discovered the possibility of a federal arrest warrant for Steffens and argues that he was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966). Steffens challenges the truthfulness of several statements contained in the affidavit in support of the warrant to search his cell phone, as well as the sufficiency of the nexus between criminal activity and his cell phone. Lillich also moves to sever Defendants' joint trial.

At the hearing, I found Lillich had forfeited any argument challenging the drug dog's alert. In Lillich's brief in support of his motion to suppress based on the lack of reasonable suspicion, he included facts about the drug dog sniff in a footnote but made no argument related to the drug dog sniff. *See* Doc. 27-1 at 3 n.7. In its resistance, the Government noted Lillich did not challenge that the drug dog sniff established probable

cause to search the vehicle. *See* Doc. 41 at 8. Lillich did not file a reply. But in his reply brief in support of his motion to suppress based on *Miranda*, Lillich argued that "[t]he actions of the canine . . . did not establish probable cause to search the interior of the vehicle." Doc. 71 at 5. He did not elaborate on why the drug dog sniff was deficient. At the hearing, he attempted to argue that the drug dog sniff of the car was tainted by officers handling the drugs found on Steffens's person, but I found the Government was not on notice of this argument. Thus, I found Lillich had forfeited any argument related to the drug dog sniff and prevented him from developing evidence on this issue at the hearing.

### A. Initial Contact and Detention

"In *Terry v. Ohio,* [392 U.S. 1, 30 (1968),] the Supreme Court held officers may conduct brief investigatory stops of individuals if they have a reasonable articulable suspicion of criminal activity." *United States v. Griffith*, 533 F.3d 979, 983-84 (8th Cir. 2008). Reasonable suspicion requires more than a hunch that criminal activity is afoot. *Id.* at 984. "To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective justification for a *Terry* stop." *Id.*

"[N]ot all personal contacts between law enforcement officers and citizens constitute 'seizures' for Fourth Amendment purposes," and a consensual encounter does not require reasonable suspicion. *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Law enforcement may "approach[] individuals on the street or in other public places and put[] questions to them if they are willing to listen," and the encounter is considered consensual (and does

not require reasonable suspicion) "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business.'" *United States v. Vera*, 457 F.3d 831, 834 (8th Cir. 2006) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002); *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). When determining whether a reasonable person would feel free to leave, the Eighth Circuit has identified several nonexhaustive factors to consider:

> officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*United States v. Villa-Gonzalez*, 623 F.3d 526, 532-33 (8th Cir. 2010) (citations omitted) (quoting *Griffith*, 533 F.3d at 983). "There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case." *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998).

The parties dispute whether law enforcement's initial contact with Defendants in the car wash bay constituted a *Terry* stop or a consensual encounter. That the law enforcement officers used a conversational tone of voice and did not physically touch Defendants weighs in favor of finding the encounter consensual. *See, e.g.*, *Villa-Gonzalez*, 623 F.3d at 533. The officers all wore their uniforms with their firearms holstered and visible, but they did not brandish their firearms. Officers being "visibly armed" may weigh in favor of finding the encounter nonconsensual, but this fact is not to be afforded "a great deal of weight," *id.* at 533; "because the fact that 'most law enforcement officers are armed is well known to the public,' [and] a holstered firearm is 'unlikely to contribute to the coerciveness' of an encounter with police," *Vera*, 457 F.3d at 836 (quoting *Drayton*, 536 U.S. at 205).

Sergeant Lenz and the reserve deputy introduced themselves as law enforcement, told Defendants they were checking in because of burglaries the night before, and asked Defendants to produce their identification cards, stating they needed the information for the reports they would write about the contact. The precise language used by the officers is unclear, but it is undisputed that the officers did not preface the encounter by asking Defendants if they could ask them a few questions. *Cf. **United States v. Davis***, 202 F.3d 1060, 1061-62, 1062 n.2 (8th Cir. 2000). Nor did they tell Defendants that they could refuse to comply with their requests, but an officer's failure to "specifically advise [a person] of his right to walk away," standing alone, "does not elevate the encounter to a seizure, absent some other evidence of coercion or restricted freedom." ***United States v. Hathcock***, 103 F.3d 715, 718-19 (8th Cir. 1997); *see also **Mendenhall***, 446 U.S. at 555-56.

"A request to see identification is not a seizure, 'as long as the police do not convey a message that compliance with their request[] is required.'" ***Vera***, 457 F.3d at 835 (quoting ***Bostick***, 501 U.S. at 435). "There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse." ***Id.*** (citing ***Drayton***, 536 U.S. at 206-07). Here, Defendants stopped what they were doing—drying the car—to produce their identification cards for the officers, which Sergeant Lenz kept. Defendants stood near the officers, answering their questions, for about four minutes, then returned to tending to the car when Sergeant Lenz left the car wash bay. The reserve deputy stayed to keep an eye on them, and a third officer—Deputy Simoni—arrived on the scene, positioning himself in the only open doorway between the two car wash bays. After being gone for about three minutes, Sergeant Lenz returned and gave Defendants their identification cards back. All in all, this initial encounter lasted about seven minutes.

Whether the initial encounter was consensual is a close issue, but I ultimately determine that a reasonable person would not have felt free to leave. Sergeant Lenz kept Steffens's driver's license and Lillich's identification card, without which "a reasonable person is much less likely to believe he can simply terminate a police encounter." *Villa-Gonzalez*, 623 F.3d at 533 (citing *Florida v. Royer,* 460 U.S. 491, 503 n.9 (1983), as holding that "officers taking possession of defendant's airline ticket, luggage, and identification contributed to the determination defendant had been seized because '[a]s a practical matter, [the defendant] could not leave the airport without them'"); *cf. United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (holding that defendant was not seized when "at the time [the officer] asked to search the vehicle[, he] had everything he needed to lawfully proceed on his journey"); *United States v. Ninety One Thousand Nine Hundred Sixty Dollars ($91,960.00)*, 897 F.2d 1457, 1461 (8th Cir. 1990) (holding that defendant was not seized after noting officers "did not retain [defendant's] ticket or driver's license"). Two officers were on the scene originally, and a third officer arrived and (intentionally or unintentionally) blocked the only open doorway. Even though Defendants remained free to move around within the confines of the car wash bay, and they could have exited by opening the car wash bay garage doors, a reasonable person would have felt that the arrival of an additional officer, who blocked the only easily accessible entrance and exit, combined with Sergeant Lenz retaining their identification cards, meant that Defendants were not free to leave. Examining the totality of the circumstances, I conclude that a seizure occurred here. *See Villa-Gonzalez*, 623 F.3d at 533-34 (holding that a seizure occurred when the officers did not physically touch the defendants or use "language or intonation . . . indicating compliance was necessary," but there were three officers on the scene, two of whom were "visibly armed"; the officers positioned themselves to "limit [the defendants'] freedom of movement"; the officers made "inquisitorial statements," telling the defendants they believed they were drug

dealers; and the officers kept the defendants' identification cards*)*; ***United States v. Johnson***, 326 F.3d 1018, 1022-23 (8th Cir. 2003) (holding that "[a] reasonable person would not believe that he was free to leave a scene where three uniformed officers drew him away from their party, stood closely at either side of him, and took possession of his personal property—here, his driver's license—while conducting a brief interrogation," even though the officers used a polite tone of voice); *cf. **Oglesby v. Lesan***, ---F. 3d ---, No. 18-1827, 2019 WL 2842219, at *1, *3-4 (8th Cir. July 3, 2019) (holding that no seizure occurred when the officer kept possession of defendant's driver's license for fifteen minutes, but there was only one officer on the scene and she did not block defendant's exit); ***Vera***, 457 F.3d at 833, 835-36 (holding that no seizure occurred when officer took possession of defendant's driver's license, but only one officer was on the scene, and he prefaced requests to exit the vehicle and to sit in the patrol car by asking whether defendant "would mind" doing so).[6]

Nevertheless, I conclude that the officers had reasonable, articulable suspicion for the investigatory stop. Sergeant Lenz testified that he found it suspicious someone would be washing his or her car at 3:00 a.m., as he had never seen someone at a car wash that late at night; that there had been two break-ins in Sloan the night before; that he was aware of recent car wash burglaries in nearby towns; and that there had been an attempted burglary at the Sloan car wash about a month prior. It was also reasonable for Sergeant Lenz to find it suspicious that the occupied car wash bay had both garage doors closed, while an empty bay had one garage door open (even though the car wash owner's testimony establishes that it was normal for both car wash bay garage doors to be closed

---

[6] In *Griffith*, the case relied upon by the Government, the officers neither took possession of the vehicle occupants' licenses nor positioned themselves to block them from leaving. 533 F.3d at 981, 983.

during the winter months). Sergeant Lenz also testified that he saw Steffens act in a manner that he believed was consistent with a lookout.[7] Given these facts, the officers had a reasonable, articulable suspicion that criminal activity was afoot, and they could briefly stop Defendants to investigate.

Steffens argues that any reasonable suspicion dissipated as soon as the officers entered the car wash bay and found Defendants drying a wet car, with no signs that Defendants were attempting to steal money from the cash machine. "[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993). "[R]easonable suspicion d[oes] not dissolve simply because . . . [the officer's] initial investigation did not bolster his original suspicion." *United States v. Mosley*, 878 F.3d 246, 254 (8th Cir. 2017).

I disagree that reasonable suspicion dissipated upon the officers entering the car wash bay. First, because Sergeant Lenz believed he saw Steffens acting as a lookout, further investigation was necessary to ensure that Defendants were not putting on an act after possibly seeing a marked squad car in the area (especially since Sergeant Lenz drove past the car wash a couple times before parking to watch the car wash). Second, the officers could reasonably ask for Defendants' identification cards within the scope of the *Terry* stop. *See Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 186 (2004) ("[Q]uestions concerning a suspect's identity are a routine and accepted part of many *Terry* stops. . . . Obtaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder."); *United States v. Esquivias*, 416 F.3d 696, 701-02 (8th Cir. 2005) (during a Terry stop, officers may "ask 'a moderate number of questions to determine [a

---

[7] Defendants challenge the accuracy of these statements, which is discussed more fully below in the section analyzing the *Franks* issues.

suspect's] identity *and* to try to obtain information confirming or dispelling the officer's suspicions'" (quoting ***United States v. Rodriguez-Arreola***, 270 F.3d 611, 617 (8th Cir. 2001))); ***United States v. Beck***, 140 F.3d 1129, 1134-35 (8th Cir. 1998); ***United States v. Tuley***, 161 F.3d 513, 515 (8th Cir. 1998). The initial encounter with Defendants lasted for approximately seven minutes while the officers asked Defendants about their presence in the car wash at 3:00 a.m. and ran the information from their identification cards through dispatch. After seeing no further reason to detain Defendants, the officers started to leave. The duration of the initial *Terry* stop was reasonable.

Within thirty seconds of leaving the occupied car wash bay, the officers received a notification from dispatch regarding a "hit" for an outstanding federal arrest warrant for Steffens. The officers returned to the car wash bay, detaining Defendants for a second time—Lillich asked the officers if they were free to go, and Sergeant Lenz responded, "No, not right now, you might have a warrant, so we're checking on that."

The officers could reasonably detain Steffens while they confirmed the existence of an outstanding arrest warrant.[8] *See **United States v. Simmons***, 172 F.3d 775, 779 (11th Cir. 1999) (holding that when officers had a "reasonable suspicion" that an outstanding warrant existed for defendant, the officers could prolong defendant's detention "to investigate further whether he was the subject of the outstanding . . . warrant"); ***Tuley***, 161 F.3d at 515 (concluding that "the whole of the investigatory stop, which lasted the twenty minutes it took to confirm that the warrant was still outstanding, complied with *Terry*'s mandate to stay within the scope of the circumstances justifying the initial stop," even though officers initially stopped defendant to investigate his presence at a gas station in the middle of the night because there had been recent attempted robberies of gas stations in the area); ***United States v. Roberts***, No. CRIM. 01-CR-251,

---

[8] Indeed, Steffens does not appear to challenge this point.

2002 WL 32341802, at *1-3 (E.D. Pa. Oct. 31, 2002) (holding that when running the information from defendant's license indicated "there was possibly an active deportation warrant outstanding for [d]efendant," the officer could detain defendant while "try[ing] to verify the existence of the deportation warrant"); *see also United States v. Hensley*, 469 U.S. 221, 232 (1985) (holding that when a police department had reasonable suspicion defendant had committed an offense and circulated a flyer or bulletin to that effect, an officer with a different department could stop defendant based on the bulletin "to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information"); *cf. Bechman v. Magill*, 745 F.3d 331, 334-36 (8th Cir. 2014) (§ 1983 case) (holding that a "hit" on a database indicating the possible existence of an outstanding arrest warrant does not supply an officer with probable cause to arrest when the warrant has not been verified). But the possibility of an arrest warrant for Steffens could not justify the continued detention of Lillich, who officers told was not free to leave prior to the discovery of drugs on Steffens's person. I do not find that officers had reasonable suspicion to detain Lillich in the interim between the conclusion of the initial stop and before finding drugs on Steffens's person.

Nevertheless, I find that the inevitable-discovery doctrine precludes suppression of the drugs found in the vehicle. Evidence obtained in violation of the Fourth Amendment "need not be suppressed if" a preponderance of the evidence establishes "(1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008); *see also id.* at 861-62 (Colloton, J., concurring, joined by Benton, J.) (arguing that the first prong of the inevitable-discovery test is overinclusive, as the test is simply whether evidence would have been lawfully discovered; and that the second prong of the test is underinclusive).

Almost immediately after Lillich requested to leave, the officers conducted a pat-down search of Steffens's person and discovered methamphetamine. The discovery of methamphetamine on Steffens's person, combined with the other facts known to the officers (including Steffens's "lookout" behavior earlier and the possible outstanding federal arrest warrant related to drug trafficking for Steffens), gave the officers reasonable, articulable suspicion to detain Lillich and his vehicle, which Steffens had been driving, until a K-9 officer could come to the scene and conduct a drug dog sniff of the vehicle. *Cf. United States v. Caves*, 890 F.2d 87, 90-91 (8th Cir. 1989) (holding that officer had probable cause to believe vehicle contained unused marijuana when officer smelled "the odor of burnt marijuana on [the driver's] person and breath," but not emanating from the car, and the officer knew the driver "had just emerged from a vehicle driven from another state several hundred miles away," suggesting "the vehicle was the probable location where [the driver] had smoked marijuana or at least had been in the presence of the drug while it was being smoked"). Because Lillich did not have a driver's license, he could not have left with the car prior to the discovery of drugs on Steffens's person, even if he had been permitted to leave—he would have had to call someone to give him a ride, and that person would not have arrived within the short time that the officers developed reasonable suspicion to detain the car for a drug dog sniff. Discovery of the drugs in the car was thus inevitable.

Lillich could have left the car wash bay on foot, however, if he had been permitted to leave prior to the discovery of drugs on Steffens's person—indeed, Lillich later asked the officers if he could walk back to the casino to try to find someone there to give him a ride. Lillich did not have his phone on his person—it was in the car, and later, officers had a difficult time finding it on Lillich's behalf, despite Lillich telling them where he believed the phone was located. Given that Sergeant Lenz discovered drugs on Steffens's person within a minute of Lillich asking whether he was free to leave (*see* Govt. Ex. 1,

1:11-2:06), I do not find that Lillich could have left the car wash bay with his phone prior to the discovery of drugs on Steffens's person. Thus, I find that the inevitable-discovery doctrine also bars suppression of the evidence from Lillich's phone.

The inevitable-discovery doctrine does not save from suppression the statements Lillich made to officers after he asked to leave. A preponderance of the evidence does not establish a "reasonable probability" that in the absence of Lillich's unlawful detainment, he would have remained at the car wash bay and continued to speak to the officers. Moreover, it is not clear that Deputy Simoni and the reserve deputy would have tried to track down Lillich once drugs were found on Steffens—Deputy Simoni told Lillich to "start calling" someone for a ride upon Steffens's arrest, and it appears that he would have allowed Lillich to access his vehicle, suggesting he would not have immediately chased after Lillich if he had left a minute earlier. And although Sergeant Lenz ultimately stopped Lillich from obtaining his phone from the car, he was preoccupied with arresting Steffens, so neither is it likely that he would have tried to stop Lillich right away. A preponderance of the evidence does not establish a "reasonable probability" that the officers would have stopped Lillich and continued to detain him if he had been able to leave the scene when he asked. Thus, I recommend that the statements Lillich made after he asked to leave should be suppressed as fruits of the unlawful seizure.

### B. Lack of Miranda Warnings

Lillich argues that the officers' questioning of Lillich while he was being detained amounted to custodial interrogation and as such, required the officers to read him his *Miranda* rights. He relies on *United States v. Laurita*, 821 F.3d 1020 (8th Cir. 2016),

in which the court found a consensual interview did not amount to a custodial interrogation after analyzing factors supporting that a reasonable person would have felt free to leave.

Here, as discussed above, Lillich was not free to leave after the officers came back for a second time upon discovering the possibility of an arrest warrant for Steffens, and they lacked reasonable suspicion to detain him until the discovery of drugs on Steffens's person. For that reason, I recommend suppressing Lillich's statements. If the district court disagrees and finds that prior to the discovery of drugs, the encounter was either consensual or supported by reasonable suspicion, then the lack of *Miranda* warnings would not require Lillich's statements to be suppressed. Although a person detained during a *Terry* stop "is not free to leave . . . until the completion of a reasonably brief investigation, which may include limited questioning," such stops do not usually render the detainee "in custody" for purposes of *Miranda*. ***United States v. Pelayo-Ruelas***, 345 F.3d 589, 592 (8th Cir. 2003). The relevant inquiry is whether the suspect's "freedom of action is curtailed to a 'degree associated with formal arrest.'" ***United States v. Johnson***, 64 F.3d 1120, 1126 (8th Cir. 1995) (quoting ***Berkemer v. McCarty***, 468 U.S. 420, 440 (1984)).

At first, officers told Lillich he was not free to leave while they confirmed whether Steffens had a warrant. Later, officers explicitly said that although he was being detained while they waited for the arrival of a K-9 officer, he was not under arrest. Lillich was not handcuffed. Officers permitted him to smoke, but he was not allowed to leave the car wash bay and smoke outside when he first asked. After officers discovered drugs on Steffens, Lillich was not permitted to access his car (although officers offered to retrieve items on his behalf). I do not find that Lillich's detention amounted to a formal arrest, and *Miranda* warnings were thus not required. ***See Pelayo-Ruelas***, 345 F.3d at 590 (holding that when defendant informed agent he was not in the country legally, and the

officer asked the defendant to step out of the car and conducted a *Terry* pat-down search of defendant's person, he was not in custody for purposes of *Miranda*); ***United States v. Rodriguez-Arreola***, 270 F.3d 611, 617 (8th Cir. 2001) (holding that when officer stopped defendant for speeding and asked him to sit in the squad car while the officer wrote the ticket, the defendant was not in custody for purposes of *Miranda*).   Accordingly, I recommend denying Lillich's motion to suppress based on *Miranda* (Doc. 56).

### C. Nexus

Steffens argues that the warrant to search his cell phone is not supported by probable cause because the affidavit fails to demonstrate a nexus between his cell phone and his drug-trafficking activity.   In accordance with "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." ***Illinois v. Gates***, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting ***Jones v. United States***, 362 U.S. 257, 271 (1960)); *accord* ***United States v. Buchanan***, 574 F.3d 554, 561 (8th Cir. 2009).[9]   Probable cause exists when, "under the totality of the circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence." ***United States v. Faulkner***, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016).   "[T]o support an application for a search

---

[9] Steffens does not take issue with my review of probable cause for the motion to suppress, even though I was the judge who signed the warrant originally. *See also* ***United States v. Mathis***, No. 18CR181DWFLIB, 2018 WL 4473529, at *10-11 (D. Minn. July 17, 2018) (collecting cases holding that for purposes of a motion to suppress, a magistrate judge may address the existence of probable cause to support a warrant that the magistrate judge had issued), *report and recommendation adopted*, 2018 WL 4062741 (Aug. 27, 2018).

warrant, '[t]here must be evidence of a nexus between the contraband and the place to be searched.' Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)).

Here, the affidavit in support of the search warrant provided probable cause that Steffens and Lillich were involved in drug trafficking: officers found two pounds of methamphetamine and twenty-eight grams of cocaine in a bag on the passenger seat of the car they had occupied; officers discovered a small amount of methamphetamine in a baggie in Steffens's pocket; officers believed Steffens had acted like he was looking for someone or for police while at the car wash at 3:00 a.m. with the drugs;[10] and Steffens had been federally indicted "for a drug (methamphetamine) violation" based on different conduct (although the affidavit does not elaborate on that conduct). In addition, the affidavit sets forth information from a post-arrest interview with Steffens in which he outlined how he ended up at the car wash with Lillich the night of their arrest: a third party called him and told him to pick up Lillich (who Steffens knew only as "J") and give him a ride; Steffens received a ride to the casino and met with Lillich; and Lillich instructed Steffens to drive his car to Sioux City because he did not have a valid driver's license, but first, to stop at the car wash.

The information in the affidavit establishes a "fair probability" that evidence of drug trafficking would be found on Steffens's cell phone. Three facts in the affidavit establish the requisite nexus between the cell phone and evidence of criminal activity: (1) officers found the cell phone on Steffens's person in the same pocket as a baggie of methamphetamine and on the scene where more drugs were later discovered; (2) the

---

[10] Even if this statement was omitted (as will be discussed below), the affidavit would still provide probable cause that Steffens and Lillich were involved in drug trafficking.

affidavit established probable cause that Steffens was involved in drug trafficking and included a "belief statement" that in the affiant officer's training and experience, drug traffickers use cell phones to conduct business, including to keep records and communicate regarding drug trafficking; and (3) Steffens told officers in an interview that the reason he had gone to the casino to meet with Lillich and drive Lillich's car (in which officers discovered drugs) was that a third party, who Steffens refused to name, had called and instructed him to do so. This is not a case in which the affidavit relied solely on the officer's "belief statement" or solely on the proximity of the phone to drugs to establish the nexus. *See United States v. Herbst*, No. 17-CR-4059-LTS, 2017 WL 9440792, at \*15-17 (N.D. Iowa Dec. 21, 2017) (holding that when officers had information from a confidential informant that defendant was involved in drug trafficking and seized from his vehicle a cell phone, medicinal marijuana purchased in Colorado, $705 in currency, a nonpermitted firearm, and a safe that officers had probable cause to believe contained drugs, the affidavit did not establish the requisite nexus between the cell phone and drug trafficking; the affidavit did not include a "belief statement"), *report and recommendation adopted*, 2018 WL 445532 (Jan. 16, 2018); *United States v. Ramirez*, 180 F. Supp. 3d 491, 493-96 (W.D. Ky. 2016) (holding that when affidavit stated only that the cell phone was found on defendant's person upon his arrest for conspiring to possess marijuana with the intent to distribute—without including any of the facts underlying the charge—and included a general "belief statement" about individuals keeping evidence of crimes on their cell phones (nonspecific to drug trafficking), affidavit did not establish probable cause to search defendant's phone).[11] In

---

[11] Prior to the Supreme Court's decision in in *Riley v. California*, 134 S. Ct. 2473 (2014), in which the Supreme Court held law enforcement could not search a defendant's cell phone under the search-incident-to-arrest exception to the warrant requirement, courts sometimes held otherwise. *See United States v. Harris*, No. 3:15CR170, 2016 WL 1441382, at \*11-13 (E.D.

addition to *both* of those facts, the affidavit connected Steffens's phone to his presence in the car wash, where officers discovered pound-quantities of methamphetamine, and a "fair probability" existed that the third-party call to Steffens directing him to pick up Lillich related to drug trafficking. The affidavit established the nexus and probable cause necessary to search Steffens's cell phone. *See United States v. Vega-Cervantes*, No. 1:14-CR-234-WSD, 2015 WL 4877657, at *16-18 (N.D. Ga. Aug. 13, 2015) (holding that probable cause existed to search defendant's cell phone when he paid an informant working with police $1,000 for the delivery of fifteen gallons of liquid methamphetamine; police seized the cell phone from his person after the delivery; defendant's coconspirator, present in the same vehicle as him, had communicated with the informant about the delivery by phone (but not using defendant's phone); and the affidavit contained a "belief statement" regarding the use of cell phones in drug trafficking); *United States v. Herevia*, No. CRIM. RDB-13-639, 2014 WL 4784321, at *8 (D. Md. Sept. 23, 2014) (holding that when officers knew the driver of the vehicle in which defendant was a passenger regularly trafficked cocaine from Mexico to Delaware for distribution; officers discovered eighteen kilograms of cocaine, $30,000 of currency, and two cell phones in the vehicle; and officers included "belief statement" regarding the use of cell phones in drug trafficking; probable cause existed to search the cell phones found in the vehicle), *aff'd sub nom United States v. Winston*, 651 F. App'x 237 (4th Cir. 2016) (not addressing issue).

Va. Apr. 11, 2016) (collecting cases—most issued prior the Supreme Court's decision in *Riley*— "conclud[ing] that probable cause to search a cell phone exists simply because cell phones discovered in proximity to crime or contraband almost invariably contain incriminating evidence" or that "probable cause existed . . . based solely on law enforcement experience that cell phones found near illegal activity are highly likely to contain incriminating evidence"), *aff'd*, 688 F. App'x 223 (4th Cir. 2017).

Even if the affidavit did not establish probable cause, the good-faith exception to the exclusionary rule would apply. *See United States v. Merriweather*, 728 F. App'x 498, 505-06 (6th Cir. 2018) (declining to address whether affidavit established nexus between phone and drug-trafficking activity and holding instead that good-faith exception applied when affidavit stated a confidential informant had made two controlled purchases from defendant after arranging the purchases through cell phone communications with a coconspirator; the affidavit stated "the particular cell phone at issue was found in a vehicle containing . . . the very drugs involved in the conspiracy"; and the affidavit contained a "belief statement" regarding cell phone use and drug trafficking), *cert. denied*, 139 S. Ct. 192 (2018); *Herbst*, 2017 WL 9440792, at *16-17 (good-faith exception applied when officer had information about defendant's involvement in drug trafficking, officer found defendant's cell phone in vehicle that contained evidence of drug trafficking, and officer knew, "based on his training and experience, that drug dealers often use cell phones to conduct drug sales and purchases, and that those phones . . . may contain information related to their drug activity"). I do not recommend suppressing evidence obtained as a result of the search warrant for Steffens's cell phone.

### D. Franks Issues

When a judge issues a search warrant based on "on an affidavit containing false or omitted statements, the resulting search warrant may be invalid." *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). To invalidate the warrant, the defendant must show, by a preponderance of evidence, (1) that the affiant acted intentionally or with reckless disregard in making the false statement or material omissions, and (2) that the affidavit would not support a finding of probable cause if the false statements were left out of, or the material omissions were included in, the affidavit. *Id.* This standard comes from the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154.

To be entitled to a *Franks* hearing, "a defendant must make a substantial preliminary showing that includes 'allegations of deliberate falsehood or of reckless disregard for the truth.'" *Williams*, 477 F.3d at 557 (quoting *Franks*, 438 U.S. at 171). "This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). This requirement is based on "a presumption of validity with respect to the affidavit supporting the search warrant." *Williams*, 477 F.3d at 558. "Because a warrant application need only show facts establishing probable cause, reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause." *United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) (cleaned up). Put another way, the defendant must show that probable cause would not have existed if the false information had been omitted from the affidavit, or if the omitted information had been included in the affidavit. *See Gonzalez*, 781 F.3d at 431. If the affidavit would still provide probable cause to issue a search warrant, the defendant fails to make the necessary preliminary showing for a *Franks* hearing. *Id.*; *see also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013).

Steffens challenges the truthfulness of three statements in the affidavit: (1) that "[Sergeant] Lenz was aware that recent burglaries had occurred in the Sloan area in the overnight hours"; (2) that Sergeant Lenz had "experience with subjects entering the wash bays and drilling through the locks to steal the money from the wash machines"; and (3) that "[Sergeant] Lenz observed a subject looking out of the wash bay and looking around in a suspicious way as if the subject was looking for someone or watching out for potential police." Doc. 50-2 at 3. I granted Steffens a *Franks* hearing based on evidence

he offered at the suppression hearing: the surveillance video footage from the car wash and the testimony of Neldeberg, the owner of the car wash in Sloan, Iowa.

After receiving all the evidence at the suppression hearing, however, a preponderance of the evidence does not establish a *Franks* violation. Sergeant Lenz testified on direct examination that he was on patrol in Sloan, Iowa, on February 3, 2019, because two break-ins had occurred in Sloan the night before, at the church and the school. On cross-examination, however, he could not say what time of day these break-ins occurred. Sergeant Lenz also testified that he had known about the attempted burglary of the Sloan car wash that occurred on January 1, 2019, at around 6:50 p.m. *See* Doc. 74. Although Neldeberg initially testified that the prior attempted burglary of his car wash was never reported to police, on cross-examination, he admitted that he had told a deputy friend of his about it informally and that his son could have given surveillance footage capturing the prior attempted burglary to police. The Government also submitted a sheriff's office report about the incident. Doc. 74. I find that this evidence supports the veracity of the statement in the affidavit that "[Sergeant] Lenz was aware that recent burglaries had occurred in the Sloan area in the overnight hours." (At the hearing, Steffens conceded that recent burglaries had occurred in the Sloan area, but argued Sergeant Lenz did not know they occurred in the "overnight hours.") Moreover, as will be discussed below, even if a false statement, the evidence does not establish that the falsity was included intentionally or recklessly, and the affidavit would support a finding of probable cause even if the statement was omitted.

Sergeant Lenz also testified about his awareness of recent car wash burglaries in three cities in Woodbury County and in two surrounding counties. He did not testify whether any of these burglaries specifically involved suspects "drilling through the locks" of cash machines, but he believed they generally involved suspects stealing money from the cash machines in some manner. The January 1 attempted burglary at the Sloan car

wash involved a suspect using a "shiny tool" to try to access a cash machine in a car wash bay by chiseling off rivets (not by using a drill). *See* Doc. 74. Although the evidence does not support that Sergeant Lenz was aware of car wash burglaries in which suspects "drill[ed] through the locks" of cash machines, it does establish that he was aware of a rash of recent car wash burglaries in the area. Even though the statement about the modus operandi does not appear to be supported, no evidence establishes that it was an intentionally or recklessly false statement, as it was immaterial to a finding of probable cause (as will be discussed further below).

Finally, I credit Sergeant Lenz's testimony that when he saw Steffens walk from the closed bay to the open bay and briefly look out through the open bay door, he believed he might have been acting as a lookout or otherwise acting suspiciously by coming to investigate the sound of Sergeant Lenz's car driving by. I recognize that by watching the surveillance footage from the car wash, and with the benefit of hindsight, it appears that Steffens is simply bored, walking around the closed car wash bay while Lillich washes the car and briefly stopping (for about a second) in the door between the closed and open bays. But I also believe that this behavior could have appeared suspicious to Sergeant Lenz. Sergeant Lenz did not testify, however, and the video evidence does not support, that Steffens "look[ed] around" in any way, as stated in the affidavit.

I note that whether to credit Sergeant Lenz on the "lookout" issue was close, based on statements he made on the scene regarding what he had seen Steffens do. Deputy Simoni relayed to Sergeant Sands that Sergeant Lenz had said Steffens "kept looking around the corner like they were meeting someone to sell," suggesting that he had seen Steffens peek his head around the corner more than once. Govt. Ex. 4, 14:47. At the hearing, Sergeant Sands testified he was told (perhaps by Deputy Simoni) that Steffens had gone into the open bay and "looked both ways" and that Steffens had looked out of the car wash bay more than once. This information also made its way into Sergeant

Sands's report on the encounter. In addition, Sergeant Lenz told Lillich on the scene that he had been "sitting up the street watching you guys, and [Steffens] kept peeking his head around the corner." Govt. Ex. 1, 9:59. Despite pushback from Lillich, Sergeant Lenz was adamant about what he had seen. *Id.*

The surveillance footage from the car wash shows only one instance of Steffens looking out the open bay door; he did not "peek his head around the corner" multiple times, as Sergeant Lenz portrayed on the scene.[12] Moreover, Sergeant Lenz did not testify at the hearing that he had mistakenly believed he had seen Steffens poke his head around the corner more than once, so it appears his comments to Lillich and the other officers on the scene were exaggerations. I find, however, that Sergeant Lenz truly did find suspicious the one instance of Steffens looking out the open bay door from the back of the bay, which is bolstered by the fact that Sergeant Lenz and the reserve deputy appeared on the scene within thirty seconds of Steffens doing so. The affidavit does not say that Sergeant Lenz saw Steffens act as a lookout more than once, so the only part of the statement in the affidavit that is false is that Sergeant Lenz saw Steffens "look[] around."

Even if all of the challenged statements were omitted from the affidavit in their totality, the affidavit would still provide probable cause that Steffens and Lillich were involved in drug trafficking, based on the evidence that officers discovered pound quantities of methamphetamine in their vehicle. The statements establishing a nexus between their drug-trafficking activities and Steffens's cell phone would also still exist.

---

[12] It appears Lillich may have stepped into the open bay (as Steffens had) around the time they first arrived at the car wash. Govt. Ex. 2a at 2:34:30, 2:37:10; Govt. Ex. 2b at 2:34:30 and 2:37:00. Although possible, based on the videos and testimony, it does not appear that Sergeant Lenz saw this or was referring to it that night at the scene (the first time this occurs, the car had not yet pulled into the car wash bay, and Sergeant Lenz testified that his attention was first drawn to the car wash when he noticed the car in the closed bay).

Thus, even if the statements are false, and even if they were included in the affidavit intentionally or recklessly (a fact I seriously doubt), they were immaterial to the probable-cause finding, and no *Franks* violation occurred. Accordingly, I recommend denying Steffens's motion to suppress (Doc. 50).

### E. Motion to Sever

Defendant Lillich moves to sever his joint trial with Defendant Steffens. Doc. 42. Under Federal Rule of Criminal Procedure 8(b), an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction . . . constituting an offense." Under Federal Rule of Criminal Procedure 14(a), "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials or provide any other relief that justice requires."

Lillich argues that joinder is prejudicial because his defense is hostile to and inconsistent with Steffens's defense. He represents that he intends to argue at trial that the drugs found in the passenger seat of his car were placed there by Steffens and that he had no knowledge of their existence. His defense is based in part on the surveillance video footage from the car wash, which shows that at first, Steffens stayed in the driver's seat of the car while Lillich washed the car—Lillich argues that this is when Steffens placed the drugs on the passenger seat. Steffens further notes that neither he nor Lillich made incriminating statements about the drugs and posits that both will blame the other at trial for their existence in the car. The Government responds that it will offer evidence at trial of "text messages between the two men discussing drug trafficking," as well as witness testimony "about methamphetamine dealings with either [Lillich] or . . . Steffens." Doc. 45 at 1-2.

The defendant bears the burden of proving prejudice justifying severance. ***United States v. Sandstrom***, 594 F.3d 634, 644 (8th Cir. 2010). "A defendant can show real prejudice either by showing that his defense is irreconcilable with the defense of his codefendant . . . or that the jury will be unable to compartmentalize the evidence as it relates to separate defendants." ***Id.*** (quoting ***United States v. Shivers***, 66 F.3d 938, 940 (8th Cir. 1995)). "'Antagonistic' defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*." ***Id.*** (quoting ***United States v. Delpit***, 94 F.3d 1134, 1143 (8th Cir. 1996)). In addition, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." ***Id.*** at 645 (quoting ***United States v. Zafiro***, 506 U.S. 534, 539 (1993)).

Lillich's attempt to distinguish *Zafiro* proves unsuccessful. In that case, law enforcement followed two suspects to an apartment, and when law enforcement announced their presence as police, the suspects dropped the box they were carrying (which contained drugs) and ran into an apartment. 506 U.S. at 535-36. The officers followed them into the apartment and discovered two additional people, one of whom lived in the apartment and the other of whom was her boyfriend. ***Id.*** at 536. When the officers obtained a search warrant for the apartment, they discovered a suitcase containing pound quantities of drugs in a bedroom closet. ***Id.*** The defendant who rented the apartment testified that her boyfriend "stayed in her apartment occasionally [and] kept some clothes there" and that "[a]lthough she allowed [her boyfriend] to store a suitcase in her closet, . . . she had no idea that the suitcase contained illegal drugs." ***Id.*** On the other hand, her boyfriend (also a defendant), argued that he "was only visiting his girlfriend and had no idea that she was involved in distributing drugs." ***Id.*** The Supreme Court rejected the defendants' arguments that "the very nature of their defenses"—that

they both claimed innocence and accused the other of possessing the drugs—"prejudiced them," and the Court affirmed the denial of the severance motion. *Id.* at 540.

Lillich argues that *Zafiro* is distinguishable because in that case, both defendants exercised control over the drugs, since they were found in the suitcase of one defendant, which was located in the residence of another defendant. But it is not clear from the *Zafiro* decision that either defendant admitted to ownership of the suitcase. Instead, *Zafiro* is analogous to the facts here—one defendant owns the property where drugs are found (in *Zafiro*, a house; here, a car), but both defendants have access to the property and could have put the drugs there without the other's knowledge. Here, as in *Zafiro*, that Lillich and Steffens may both point the finger at the other is insufficient to demonstrate prejudice. *See United States v. Lewis*, 557 F.3d 601, 610 (8th Cir. 2009) ("It is not sufficient that one defendant be taking the position that he knew nothing of the crime while asserting that his codefendant was involved." (quoting *United States v. Lynch,* 800 F.2d 765, 768 (8th Cir.1986)). The jury will be "free to disbelieve . . . both of [defendants'] shift-the-blame-to-the-other-defendant stories." *United States v. Shivers*, 66 F.3d at 940 (per curiam) (affirming denial of severance when defendant met with codefendant as codefendant left the airport carrying a duffel bag; they got into a car driven by a third party; officers discovered large amounts of currency in the duffel bag and bundles of cocaine in a box near defendant's feet; and both defendant and codefendant denied knowledge of the cocaine and blamed the other for its existence in the car). Moreover, any inconsistency between Lillich's and Steffens's defenses will not cause the jury to infer guilt, because the government intends to "offer[] evidence independent of the conflicting defenses to prove that" Lillich committed the drug offenses charged. *See United States v. Martin*, 777 F.3d 984, 995 (8th Cir. 2015).

Accordingly, I recommend that Lillich's motion to sever (Doc. 42) be **denied**.

### III.  CONCLUSION

I respectfully recommend that the district court **grant in part and deny in part** Lillich's motion to suppress evidence related to the investigatory stop (Doc. 27), **deny** Lillich's motion to suppress related to the lack of *Miranda* warnings (Doc. 56), **deny** Steffens's motion to suppress (Doc. 50), and **deny** Lillich's motion to sever (Doc. 42). I recommend suppressing Lillich's statements on the scene after he asked to leave, but no other evidence.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections.  A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.  **LCrR 59**.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* **Fed. R. Crim. P. 59**.  Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 23rd day of July, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa